and others, defendants Gary Hedger and others, defendants Apolise, arguments not to exceed 15 minutes per side. Mr. Palmer for the appellant. Good morning, good morning, Robert Palmer appearing on behalf of the plaintiff, I have my associate Robin Wagner with me this morning. Are you reserving time? I would like to reserve three minutes, your honor, if I may. You may proceed. All right. This case is a fact-intensive case. It involves the unconstitutional shooting of an unarmed, 5 foot 6, emotionally disturbed, incapacitated by position, individual who at the time he was shot did not pose a threat to the deputies or anyone else based upon his positioning. I think I'll start off by addressing the questions that the court asked me, seems like a good place to start. The court was, the question I received was whether or not this case should be remanded for an analysis of Deputy Hedger's responsibility and I would argue to the court that it's not necessary for two reasons. The first reason is that Judge Cleland by implication decided the Hedger issue. He made a determination that in segmenting he was only going to look at the last two seconds when the shooting occurred and by making that determination in terms of the segmentation analysis, he implicitly ruled that nothing that Hedger did is important or relevant. So I would argue to the court he actually decided that issue by his non-decision. Can I interrupt you already? Sure. Did you actually argue before the district court that Hedger's orders to Myers and Portrats were a separate use of force distinct from the shooting? Because that seems to me like that's what you want us to answer now. In the brief we did, we didn't get oral argument. So I didn't have an opportunity to argue that to the court. Our brief is very similar. But you presented a motion on summary judgment, right? Exactly. But I didn't get an opportunity to... Right, but to me when I read your brief it didn't seem to me that that segment that you're segmenting out here on appeal, I would call it segment one, was actually presented to the district court. So therefore the district court didn't rule on it because it's kind of a different theory here on appeal. I believe the briefs did raise it, the summary disposition briefs, because they're very similar to the ones that are before the court here. Okay. I'll go back and look at that, but is there a... Sure, sure. And to be honest with you, I haven't read them in a while. But I believe, I mean, it's always been our theory from the beginning to think how it's been pled. So I can't believe that it's not addressed through the pleadings. All right, fair enough. Secondly, I think this court has previously in the case of Abel versus Harp decided that the court has jurisdiction to canvas the record to determine whether plaintiff's facts as necessarily within the record can be analyzed. And in that particular case, as the court may recall, the district judge didn't even analyze the qualified immunity issue at all. And yet the court had sufficient facts before it at this point in time to go ahead and analyze it. And between the hundred pages of briefing, between our brief and the defendant's brief, all the facts are there for the court right now. And I think I would argue to the court that it's certainly ripe for analysis. Okay. Well, why don't you proceed with the merits of your argument then? Thank you. Okay. So what apparently, accepting the Sixth Circuit's view that you segment this analysis, which seems to be firmly implanted, the issue becomes what's a segment? And I would argue to the court that Judge Cleland's analysis of what a segment was is the microsecond when the gun goes off. He basically looks at the situation, ignores everything up until that point. And our argument is that this is not a situation where we're arguing that when they knocked on the door, that was improper and everything else flowed from the knock on the door. Our segment that we asked the court to focus on is a segment when Hedger orders the attack. This isn't a situation where he just made a bad decision. This is a situation where he knew Ronnie Graves was emotionally disturbed. He knew Ronnie Graves was sitting in a bathtub with his legs hanging over the side, unable to move. He knew he was nonresponsive and testified. But did Hedger order the deputies to shoot? He ordered Potras to be in a certain position, I believe. And he ordered or knew that Myers was walking from north to south in the hallway of the trailer. Is that correct? With guns drawn and in front of him. So remember, this trailer, it would be on a TV version of Hoarders. It was pretty full with stuff. And they decided that this hallway that they were going to walk down, they termed it a fatal funnel because for two reasons. You didn't know where you were going. And secondly, there was no way to retreat because it was so thin that only one person could go. Now, Hedger. I'm sorry to interrupt, but does it make a difference? My understanding is that Hedger never ordered Myers and Potras to fire. He did not order them to. Does that make a difference? No, because here's the situation that he was confronted with. His determination was the person that was safety was at issue was Ronnie Graves. Ronnie Graves, according to him, was a danger of suicide by cop. That was his concern, that Ronnie Graves was going to provoke someone to shoot him given his prior history. Is that an unreasonable? I think that's a great. I think I'm not faulting him for that. That's probably exactly what the situation was. And he knew that, and he decided we don't want to provoke him. We want him to get me in a position where I can tase him. So he went outside, and he attempted to tase him. He had a bad angle. So then he decides I've got to get there with my taser, and I'm going to tase him from a higher angle where I can get him in the tub. With that being said, instead of doing that, he's got Myers in front of him in a hallway that ends at the door of the bathroom, where he's got nowhere to go but to confront Ronnie Graves. He's got Potras outside with his gun pointed at him, with the AR-15 pointed at him, and he says, I think Chuck is his name, Chuck, go on in. So rather than he going in to deal with Ronnie Graves so he could tase him, he sends the guy in with the gun drawn, swearing at him, telling him to get his effing hands up. And not only that, but he participates in it. He's back there with the three officers screaming at Ronnie Graves to get your hand up, get your hand up, doing precisely what he made a determination was the wrong thing to do. So it's not that he orders to shoot. He orders this situation to happen. They're swearing at him, they're yelling at him. Myers goes to fire, so throw a chair. And what happens is exactly what Hedger predicted would happen and exactly what Hedger caused to happen by his order to send in the troops. That's with respect to the Hedger analysis. And so what happens is, guess what? Ronnie Graves makes an action that provokes the shooting. And he gets his face blown off by Potratz, who's standing outside with the AR-15, who blows half his face off. So when you say that Graves makes an action, what do you think the record shows that action is? Apparently, I'll let you answer. This doesn't come out very well in print or in the record, but what Ronnie Graves said is, I raised my hand up with a comb in it. We believe it was a broken piece of the knife because we didn't find a comb. All we found were the two handles, and it was black. I raised my hand up like this to scare him. I didn't reach forward, and nobody said that he made a move to come out of the tub, that he tried to get up. He did anything other than raise his hand up with what he thought was a knife or a comb, and it was a gun handle. And at this point in time, Myers is six, seven feet away outside the door. Even when he falls, there's no aggressive action ever made by Graves toward them. Well, let me just ask. Graves says that he – I thought he says he pointed the object. He showed it. In the document, there's a picture of him. He said, I pointed it like this. Yeah. Well, does the record reflect that he pointed the object at anyone, at Deputy Myers? Myers said that he believed that he saw the black and that he believed he was pointing a gun at him. Myers said that. Potratz didn't say that. Potratz unequivocally said, the best I thought it was, I thought it was a knife. Potratz never thought it was a gun. But doesn't Graves say in his deposition that he – well, he says, I think he pointed the object. He thought it was a comb, apparently. He said he pointed and he went just like this, and there's actually a picture of it in the – Do you think the record shows that he pointed the object upward and not toward any officer? Whether he pointed it at the officer is relevant on Myers because Myers is the one who claims it was a gun. It's not relevant with respect to Potratz because Potratz says it was a knife. So whether he goes like this or like this – Let's just say the record reflects that he pointed this dark, this black object that may have had a silver glint toward Myers. Why – I guess you then want to argue that it's objectively unreasonable for Myers to have fired. Of the three, if you ask me, which, you know, the question I always hate to put them on a hierarchy, Myers, you know, if you accept Myers' testimony, if you accept his testimony that I saw him point this at me, I fell to get out of the way and fired, if you accept that testimony, arguably he's closer to qualified immunity than the other ones. However, there's evidence in the record that he wasn't falling, that he was standing looking right at him with a clear view of him and that the trajectory of the bullet is he shot at him while he was standing, not this story he came up with that he fell. So we consider the evidence in the light most favorable to Graves, is that correct? That would be – that's what the court is supposed to do. That's not apparently what happened in the district court. So what is the evidence that's most favorable to Graves in terms of the Myers segment, the Myers shooting? Myers was in a position looking right at him, seven feet away from an elevated position with his gun pointed at him and should have had the opportunity to determine that wasn't a gun, and there was no evidence in the record anywhere that there were ever any guns involved in this situation. The assault was a knife. The knife had been retrieved. Remember, this – But even if it's a knife, I mean, is it – we seem to have a lot of cases in the Sixth Circuit where there's a knife and there is – it does not – certainly does not seem to be clearly established that the assailant or would-be assailant has to be within striking distance of the officers. It seems to me there are lots of cases where we've granted qualified immunity to people where there's a fence in between the would-be assailant and the officers, and we've said – and they use lethal force, and we've said, well, that's fine. So even if we assume it's a knife or that that's the only thing the officers could reasonably have perceived, why are the officers not entitled to qualified immunity here? Well, this is a dichotomy you get into. If you look at Stoddard, Sova, and Sposari, and you compare it to the facts on the defendant's case, which is the Chappelle case, the distinction is who's attacking, who's attacking who. In the three cases that I cite, the Stoddard case, the Sova case, the Sposari case, the assailant is coming after them, moving forward – I didn't mean to move forward. Moving forward in an aggressive posture. In Chappelle, he comes at him, and he comes out of the closet at him, and he has to shoot him. He's coming at him with a knife. In all three of those cases I cite, the defendant is standing there with a knife. One of them he's got a hatchet. The other two they have a knife, but he's not coming after them. And Graves didn't come after them. He didn't threaten them. He raised his hand to say, stay away from me. And if you condone, if the court accepts their argument, you're basically saying any time somebody holds a knife, the police can shoot them. And that's clearly not the case in this circuit. Your time is expiring. I'm sorry. Can I take just a moment to address Deputy Officer Potratz? Because my recollection of the record is that he, Potratz, thought that Myers had been shot or shot at and acted – is that incorrect? He fired because he was seeking to protect Potratz. It happened within, like, almost concurrently. First of all, if you listen, and I think you guys have the video. It's part of the record. We submitted it. It's bang, bang, bang. It's not bang, bang, bang. There's no time for that kind of thinking. And I don't believe Potratz said he thought he was shot, but if he thought he was shot, he thought he might have shot him because he actually goes through the – Potratz – I don't mean to point a gun at you, Your Honor, but Potratz has got the gun pointed and Myers falls right in front of him. He's lucky he didn't get shot by Potratz. Potratz says, I saw it was a knife. Then he later says, well, I guess not. It was a handle. But he never thought that Graves had a gun. So if he thought that Myers got shot, his only conclusion was, I shot him. Which, by the way, Myers for – I think Myers for a moment, his assessment was he thought Potratz did shoot him. But thank you. I'm sorry. Okay. You'll have your full rebuttal time. Thank you. Stepanewski. Stepanski. Yes, good morning. Please, the Court. Marcy Stepanski on behalf of the defendants at police. With respect to the court's question regarding vacature, counsel and I are in agreement that remand is not necessary because – but for different reasons. It's our position that the same result will endure. One of the things that the plaintiff pointed to in their brief and emphasized was policies that Monroe County had with respect to certain unpredictable and intense situations. And one of them involves emotionally disturbed individuals. But when you look at the policy, it actually is calling for officer caution because those kinds of situations where there's domestic disturbances or emotionally disturbed people tend to be very unpredictable. The situation tends to be very fluid. When you look at the other policy, they're on pages 4, 8, and 11, I believe. But the plaintiff forgot to mention the initial part of it, which is do these things unless immediate action is required. And in this case, they had three reasons for going in immediately. One was to locate and arrest the subject because he had just violently assaulted. He stabbed his grandmother in the head, and he lured her into the bathroom to do it. They wanted to make sure that there was not a second victim inside because dispatch had sent information that one of the emergency responders indicated there might be a second victim inside. And thirdly, plaintiff did have a history of being suicidal. The officer was well aware that this fellow was mentally disturbed, right? There was a history of him calling in suicide threats, yes, Your Honor, both by knife and by one time he threatened to blow his head off, though there wasn't an indication at that time that he had a gun. But the third reason that they went in was to make sure that he hadn't attempted suicide and needed medical care. The amount of force used was proper applying the segmented analysis or any other analysis regardless of what Hedger did or did not do. I think that the reason why the court below did not separately analyze Hedger's actions is it wasn't raised as a separate claim. It wasn't argued that way. It wasn't raised, wasn't separated out as a separate claim. Was there an argument before? There was no argument in the court below. It was kind of difficult to raise things in an argumentative way. Well, it was decided on briefs, and so whatever was in their complaint is what was briefed, and it should have been indicated in their brief as a separate issue. Otherwise it would be waived. The Supreme Court has rejected what they are proposing here, which is that officer provocation argument. The Ninth Circuit came out with a case that's discussed in our brief, and the Supreme Court rejected that, basically saying we want officers to be proactive and to be out there doing their job and protect people and make these types of arrests. And so we have to be really cautious when we try to argue that they've provoked it because if you really look at it in a very straightforward way, well, they're always doing something that would provoke it because that's sort of their job is to go and arrest these suspects. The other reason why remand is not necessary is there's no clearly established law that would require Hedger to do anything differently than what he did in this situation. I think that what plaintiff is proposing is what our Supreme Court has repeatedly said not to do, which is looking at the incident with 20-20 hindsight and Monday morning quarterbacking instead of looking at it from the officer's perspective on the scene, which is what we're required to do, and we've cited all the case law that confirms that. There's no evidence that Mr. Graves was unable to move, and I think that that was demonstrated by or rejected by the fact that he did move. And what he did do, and he demonstrated it in his deposition, and we did the still photographs in our brief at pages 13 and 14, and I would submit that what he demonstrates that he did was he pulled his hand from behind his back or from his side where the officers couldn't see it, and he pulled it forward, and he indicated that his intent was to scare the officers, and it certainly did have that effect. I think that the fact that Potratz and Meyer shot almost simultaneously was that they both perceived that to be a significant threat. What do you make of, I mean, if we assume, let's assume that the only reasonable thing that the officers could have assumed is that it's a knife. Now, I know you think it's reasonable for them to have assumed it was a gun, but I want to just move you into knife land. So if we think that it's just a knife, what's the best argument that the officers are still entitled to qualified immunity? Because your proponent would say, look, all the cases in which lethal force is okay where there's a knife is either they're in striking distance, the assailant is in striking distance, or the assailant is moving towards the officers, and here we have a guy in the bathtub. So what's your best argument? Well, with respect to that, Your Honor, I think that they're still in very close proximity, and it doesn't take much to get out of a bathtub and be a significant threat within a matter of a second or two. And especially in these situations, I know that we have all seen. No matter how deep the bathtub is, I feel like some you could really get out of fast, and some would be coming hard. Right. It probably doesn't look that deep in the pictures, I guess. Right. Well, and the other thing, too, is that when we're dealing with emotionally disturbed people, they're capable of doing some surprising things. I think that our officers encountered a number of cases. I know I've worked on several cases. I'm sure the court has as well, where they almost have superhuman strength sometimes. I mean, it takes several officers to take someone down. I mean, I don't think that it would be unreasonable to, within myself, I think the distance was closer between myself and the podium, to be fearful of someone, especially in the way that he gestured it. It wouldn't have taken much for him to get up and become a threat. But you're right, Your Honor. I think the bigger key there is that they did not know what kind of weapon it was. He certainly fashioned it like it was a gun. It was black. And our case law is very clear that an officer does not have to wait to definitely see that it's a gun pointed at him before he shoots, because by then it may be too late. The fact that he gestured like it was a gun or a weapon when the officers were in close proximity is sufficient to provide qualified immunity in this case. Let's go back to the knife scenario. I guess I want to get a sense of what case you would cite that would support your argument that officers could use lethal force in a situation like this, where you have Mr. Graves is in a bathtub, feet hanging over the edge, apparently, in somewhat of a catatonic state, or certainly staring, I think they said, a thousand feet away or a thousand yards away or something like that. There were different descriptions. I think someone said, like, with a murderous glare, and other people said with a, you know, I mean, I think different people, different witnesses gave different thoughts. We have to take the most favorable ones. Sure. So let's just assume you have the, he raised the knife. Sure. What case is similar to this? I mean, a lot of these knife and machete cases involved, as Judge Larson said, it's a person who is wielding it, and the question is whether they're in striking distance, whether there is, objectively speaking, there is a threat to the officer's safety or the safety of others. Right. I think that, Your Honor, there's, and I think what's key here is there's not one particular case that's on point. I think that there are a number of cases where the facts are a little bit different, but we've cited several in our brief that are similar, and that would be, I think it's, I don't know how to pronounce it, Unitalin. And then there's, I believe, Lemon and. There's Lopez, but that cuts against you, I think. Yeah, but there are a number of cases, and I think where the court has made a distinction has been, you know, certainly whether there's proximity, but there have been other cases where the person didn't even actually pull the weapon out. And I think one of the cases that we cited, the man had something in his waistband, they weren't sure what it was, but he was opposing the officers, resisting their commands, and then did take a step toward them and reached for it. In this case, he didn't take a step, but he definitely pulled something from behind his back in a threatening manner. And I think that this case falls within that area where you're really not sure what to do. But I think more importantly, when you're an officer on the scene and you think that, or you know he had a knife earlier because he violently assaulted his grandmother, but you don't know what other weapons are in the residence. And both of our experts agree that you have to assume the worst. You go in there, and you protect yourself, and you are armed. And it's not a situation where they knew that he only had a knife in the residence. It's not something where they had spoken to anyone trying to find out what type of weapons were. The grandmother was already transported to the hospital by the time that they got there. It sounds like you're saying the principle ought to be when in doubt, shoot. No, I'm saying just be careful. I'm saying they have to be cautious. And they have to, in these types of situations where someone violently assaulted a family member with a knife, stabbed her in the head repeatedly, they have to be careful. And they have to, and their own expert, plaintiff's own expert, indicated that he would have gone in with guns drawn as well. And so when the plaintiff makes that threatening gesture, which he admitted he intended to scare them, they were within their rights to respond with lethal force. I mean, it sounds like we're all struggling to find the right case here because we have kind of cases that are sort of in the area. Oh, my goodness. That's so embarrassing. And others that are not. But is that the plaintiff's burden? Is that what does the work for you? That's what I was just going to say, Your Honor, is that the fact that there isn't any one case on point, the plaintiff is required to provide a case that shows that the officer's conduct in this situation would have been prohibited. And they have to do it given these particularized facts. And we cited plenty of Supreme Court case law where the court has said we've had to state time and time again over the last decade that you can't look at things in a more general, you have to look at it in a particularized sense, and that this particular situation had to have been beyond debate that it wasn't allowed. And the fact that there isn't a case on point demonstrates that it wasn't clearly established, it wasn't clearly forbidden. And the cases that plaintiff has cited are factually distinct from this situation, and we detailed those distinctions in our appellee brief. Are you going to address deputy or sergeant, I'm not sure his title, Potratz at all? So, yes. Deputy Potratz was the officer that was located on the door to the south, the side door to the south, who had a view of the plaintiff. And his task was to maintain a visual on the plaintiff to make sure that the other officers would be safe. Well, when Myers crossed the path and was trying to get plaintiff to comply, and then plaintiff made the threatening gesture, Myers shot, and within a second, I think it was, Potratz shot as well. So I think that he perceived the same type of threat, and he was trying to protect the other officer that was within just a few feet of the plaintiff. Potratz, I think, testified that he thought that Myers, I don't know, these names are mixed up, Graves had a knife. Well, I think they all knew that at some point he had had a knife, but at this point they don't know what he had. What else? You're saying they don't know what else he may have had. May have had a knife and then had a gun. He had been in there for a significant period of time, and they don't know what he was doing in the meantime. They found him in the tub, but it doesn't mean that he had been there the entire time. So they don't know what other weapons he had. And then thirdly, Sergeant Hedger with the Taser, does the court wish me to address that? Yes, please do. Okay. I think the Rush case speaks to that, where you have to make sure that the threat is abated. You're allowed to use lethal force until you're sure that the threat has been abated. And in this case, when he was certainly debilitated, it did not rule out the fact that he could have had a weapon still at his disposal. And so I think that it was certainly within the parameters of qualified immunity for Hedger to tase him momentarily, to get near him, remove any weapons that he might have at his disposal, before then securing him and calling for medical. Hedger acknowledges that it was clear that, I think he said something like, half of Graves' face or a portion of it had been shot off or something like that. Graves is in the bathtub. It's clearly a very serious wound from an assault weapon. There's no indication he's otherwise resisting. But there's no indication that he's unconscious, and the fact that he had something in his hand could certainly be used as a weapon. And I think that Rush demonstrates that unless it's very clear that the person has been subdued, the officer may use a taser, may continue to use force. In this case, it was a taser. It wasn't lethal force, just something to debilitate him momentarily to make sure that he was able to secure any weapons that he might have at his disposal. So unless the Court has any questions, it looks like my time is up. Thank you. Thank you, Your Honors. I'll be relatively brief because by your questions, you've all read all the briefs. You know what the facts are. The taser issue, I think that Judge Cleland sort of wanted to have his cake and eat it too. When he's segmented, he excludes Hedger's order to send everybody in, but when Hedger tases him, he includes that as part of one event. So he wants to include Hedger's tasing in the analysis, and he wants to exclude Hedger's order in the analysis. So he kind of does the segmenting to reach the result that he reached. It's clear in a taser situation that you have to give him a warning. You've got to have some kind of noncompliance. As Judge Cole pointed out, he was sitting motionless with his face blown off, and in all honesty, pieces of his face were hanging from the sink next to him. His arms were at his side. But wait, didn't Hedger see Myers fall? So Hedger can't see. Hedger sees Myers fall, and he hears Myers shout, like, shot, shot, not hit, something like that, right? He hears him say that. Not hit, not hit, shots fired. So couldn't Hedger have thought that Graves had just shot Myers, in which case surely it was okay for him to use nonlethal force? If, in fact, that was – first of all, it's five seconds. It's not instantaneous. He doesn't do it right after. He's got five seconds. So he's literally looking at – he's behind Myers. So he sees him fall. He's literally there for him. And Myers says, not hit, not hit, shots fired. Right. He hears the shots fired. So why couldn't Hedger have reasonably thought that meant that Myers, who just fell, was not hit, not hit, but shots were fired at him? He could have inferred that just as easily as a jury or a fact finder could conclude. He had five seconds. The guy was incapacitated. It's unreasonable for him to assume. It wasn't – he gave him no orders. He did nothing. And let's say he had a gun. He wasn't brandishing anything at this time. He was sitting there completely. But can Hedger – does Hedger know that about Graves? Let me give you an example, Judge. So let's say there's a person brandishing a gun, and the police officer next to him shoots him and drops him. And now he's dropped, laying there. So now the policeman goes over just to make sure and tases him. And in Hedger's word, let him ride for five. He gave him the full dose of that. You have to couple it where a fact finder could conclude it. And also, and they make light of this, but in his deposition Hedger laughed about Myers falling. So he laughs about that, says let him ride for five. He orders this assault. A fact finder could clearly conclude he was just gratuitously tasing this gentleman. So it would be a factual issue for them to determine. And there was some representation made that perhaps he could have jumped out of the tub. He's like five foot five. His feet were not touching the ground. He made no action to jump out of the tub. He just raised his hand. So this idea that he could have shot out of the tub and attacked somebody is not consistent with the facts that were presented. He was incapacitated by his position and made no move, nothing, no attempt to get in a position where he could move. He's just laying there holding the comb, the knife handle, whatever it is up. So I think that this is a situation that should be remanded. These are, I think their qualified immunity should not be abolished. But if there's any thought that it should be, it's certainly a question of fact. This is not a clear situation where this case should be thrown out as it was. You want a jury trial? I want a jury trial, Your Honor. I absolutely want a jury trial on this one. Okay, counsel, thank you for your arguments today. We really do appreciate them. The case will be submitted.